SIRI & GLIMSTAD LLP
Aaron Siri (Pro Hac Vice To Be Filed)
Email: aaron@sirillp.com
Elizabeth A. Brehm (Pro Hac Vice To Be Filed)
Email: ebrehm@sirillp.com
200 Park Avenue
Seventeenth Floor
New York, NY 10166
Telephone: 212-532-1091
Facsimile: 646-417-5967

Caroline Tucker (SBN 261377)
Email: ctucker@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: 213-376-3739
Facsimile: 646-417-5967

CHRIS WIEST ATTORNEY AT LAW, PLLC
Chris Wiest (Pro Hac Vice To Be Filed)
Email: chris@cwiestlaw.com
25 Town Center Blvd, STE 104
Crestview Hills, KY 41017
Telephone: 513-257-1895
Facsimile: 859-495-0803

Attorneys for Plaintiffs
ROBERT MASSETH
HOLLY MASSETH

1

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| ROBERT MASSETH and HOLLY MASSETH, individually and on behalf of their minor child, J.D., <br><br> Plaintiffs, <br><br> v. <br><br> WILLIE J. JONES III, in his official capacity as the principal of Serrano High School, SNOWLINE JOINT UNIFIED SCHOOL DISTRICT, and THE SNOWLINE JUSD BOARD OF TRUSTEES a/k/a THE SNOWLINE JUSD GOVERNING BOARD a/k/a THE SNOWLINE BOARD OF EDUCATION, <br><br> Defendants. | Case No.: 5:21-cv-01408 <br><br> **PLAINTIFFS' VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, by and through their undersigned counsel, allege on personal knowledge as to themselves and upon information and belief as to all other matters:

## INTRODUCTION

1.     Plaintiffs are fully vaccinated.  Similarly, all three of their children are fully vaccinated with the exception of their middle child, J.D.,[1] who is only missing a single dose of the acellular pertussis vaccine ("**aPV**").

---

[1] The initials "J.D." stand for Jane Doe and are used for the purposes of the anonymity of Plaintiffs' minor child.

2.     As an infant, J.D. had a serious adverse reaction to an aPV and her pediatrician advised Plaintiffs that no further doses of aPV would be given to J.D. due to the high likelihood of another, and potentially worse, adverse reaction, including – as is provided in the U.S. Food and Drug Administration's ("**FDA**") warning label – encephalopathy (brain swelling) and/or serious brain damage.  Based on this medical advice, J.D has not received another dose of aPV.  When J.D. needed to provide proof of receiving aPV for school attendance, she filed a medical exemption.  J.D. is now entering 12th grade and her medical exemption for her one missing dose of aPV has been revoked because California's recent laws for obtaining a medical exemption make it effectively impossible to obtain such an exemption, even where, as is the case here, there are compelling medical indications that the particular vaccine may be dangerous to a particular person.

3.     aPV does not prevent infection and transmission of the pertussis bacteria, hence vaccination with aPV does not stop community spread.  It instead provides only personal protection from potential symptoms.   Nevertheless, Defendants intend to exclude J.D. from school solely because she is missing one dose of aPV which her pediatrician and the FDA's warning for aPV assert could cause her serious injury.

4.     Conditioning an education on the injection of one dose of aPV, and overriding Plaintiffs' informed parental decision, unquestionably impinges upon Plaintiffs' and J.D.'s fundamental constitutional rights to bodily integrity, parental choice, informed consent, free exercise, and the substantive due process right to life and liberty under the United States Constitution.  Defendants must, therefore, demonstrate both a compelling state interest to exclude J.D. from her senior year of high school and that exclusion is the least restrictive means to achieve the compelling interest.

5.     Courts have previously recognized that California's desire to control infection from student-to-student can create a sufficient compelling state interest to trump some of the foregoing constitutional rights.  However, that compelling interest to control

VERIFIED COMPLAINT

infection from person-to-person is absent with regard to the aPV because it does not prevent a vaccinated child from becoming infected and transmitting pertussis. *See, e.g.*, Vaccine (2018) https://pubmed.ncbi.nlm.nih.gov/29180031/ ("[N]either DTP, nor DTaP or Tdap prevent asymptomatic infection and silent transmission of the [pertussis] pathogen.").

6.    Researchers at the FDA and at premier universities have established that, while pertussis vaccines decrease the odds of a person experiencing the symptoms of pertussis, they create a defective form of immunity to pertussis in the person receiving this product which does not prevent him or her from becoming infected with and transmitting pertussis.  This defective immunity actually renders the individual susceptible to becoming repeatedly infected with pertussis, potentially every month, without knowing he or she is infected.  For example, sixteen scientists and professors considered world-leading experts in pertussis, a number of whom have served as advisors, consultants, public speakers, and/or advisory board members to manufacturers of pertussis vaccines, participated in a Consensus Conference organized by the World Association for Infectious Disease and Immunological Disorders on June 22, 2018, regarding the pertussis vaccine.  These scientists and professors, along with this association, then published a peer reviewed publication explaining, in relevant part, that:

> aPVs … can prevent disease **but cannot avoid infection and transmission**.
>
> ...
>
> aPV pertussis vaccines do not prevent colonization. Consequently, **they do not reduce the circulation of *B. pertussis* and do not exert any herd immunity effect.**[2]

This peer reviewed publication similarly explained in its conclusion that "[l]ack of

---

[2]  https://pubmed.ncbi.nlm.nih.gov/31333640/ (emphasis added).

4

mucosal immune responses after aPV administration favor infection, persistent colonization, and transmission of the pathogen."

7.     aPV may reduce the *symptoms* of pertussis, but those vaccinated with aPV are susceptible to becoming repeatedly infected with and transmitting pertussis.  This means that aPV only provides personal protection – not community protection.  aPV is therefore similar to eating healthy, exercising, taking one's medicine, etc., all of which may be beneficial activities the state wants to encourage, but there is no rational basis, let alone compelling interest, to exclude a child from school for not engaging in these activities.

8.     Given that aPV does not prevent person-to-person transmission, Defendants cannot rely on their desire to control infection to create the necessary compelling state interest to deny Plaintiffs' and J.D.'s constitutionally protected rights.  Requiring J.D. to receive this vaccine, especially when medically contraindicated, over Plaintiffs' objections is an unjustifiable infringement on their constitutional rights. (*Infra* Causes of Action 1 – 4.)

9.     aPV is also not without risk, especially not for J.D.  It is a well-established and indisputable fact, confirmed by the FDA, CDC, and vaccine manufacturers, that pertussis vaccines can, for some children, cause serious injury and death. (*Infra* §§ IV.B, D.)  The potential harm from these products is also confirmed by their pre-licensure clinical trials (*Infra* § IV.C) and the over one hundred serious injuries identified by their manufacturers post-licensure because they had a basis to believe there is a *causal* relationship between these injuries and their pertussis products. (*Infra* § IV.D.)  The harm caused by pertussis vaccine was, for example, the primary reason Congress passed the National Childhood Vaccine Injury Act of 1986 (the "**1986 Act**") which granted pharmaceutical companies' immunity from liability for injuries caused by their vaccine products. *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 226 (2011) ("[B]y the mid-1980's …

the remaining manufacturer [of pertussis vaccine] estimated that its potential tort liability exceeded its annual sales by a factor of 200.").

10.     Notwithstanding the potential for J.D. to suffer serious harm from receiving an aPV, and that this vaccine merely provides personal protection rather than community protection, under current California law, she cannot attend school without receiving another dose of aPV vaccine.  The only exemption to this requirement in California is a medical exemption. However, doctors in California, with the possible exception of exceedingly rare situations involving exceptional cases of immunodeficiency, are no longer willing to write medical exemptions to vaccination due to the incredible scrutiny and penalties, including loss of licensure, imposed under California law if the California Department of Health ("**CDPH**"), which reviews and can revoke exemptions, objects to the exemption.  (*Infra* § V).   The result is that children like J.D. who have suffered a serious adverse reaction after a vaccine cannot obtain a medical exemption to the vaccine which caused their injuries, even when such administration is contraindicated, and even when such administration may cause the particular child extraordinary harm.  (*Infra* § V).

11.     Given that J.D. cannot obtain a medical exemption in California, Plaintiffs' and J.D.'s only option for J.D. to attend her senior year of high school is to receive an aPV.  But requiring a vaccine which does not prevent infection and transmission, and only offers personal protection, and which could seriously harm J.D., violates her and Plaintiffs' constitutionally protected rights.  It would further violate Plaintiffs' deeply and sincerely held religious beliefs which prevent them from injecting their child with a product that they sincerely believe could harm their child.

12.     For these reasons, and those discussed below, Plaintiffs respectfully seek to enjoin Defendants from enforcing Cal. Health & Safety Code §§ 120335(b)(5) and (d) and Cal. Code Regs. Tit. 17, §§ 6025 and 6035, including as applied to J.D., to the extent these statutes and regulations require a child to have an aPV to attend school in California,

as well as declaratory relief regarding the legality and constitutionality of this requirement.

## **PARTIES**

13.    Plaintiff Holly Masseth is the mother of three children, including J.D.  J.D. is 17 years old and entering her senior year of high school at Serrano High School in the same school district Ms. Masseth attended.  Her other children are 20 and 14 years old. Ms. Masseth earned her Bachelor of Arts in Communicative Disorders from California State University and currently works as Executive Administrator at MWC Group, Inc., a construction and development company she owns with her husband, Robert Masseth.

14.    Plaintiff Robert Masseth is the father of three children, including J.D.  He earned his Bachelor of Science in Chemical Engineering from California State Polytechnic University and his Master of Business Administration from Colorado State University.  He is now President and owner of MWC Group, Inc.  Mr. and Mrs. Masseth live in Pinon Hills, County of San Bernardino, State of California.

15.    Defendant Willie J. Jones III is the principal of the Serrano High School, which J.D. has attended since ninth grade and will be excluded from attending for her twelfth and final year.  It is located in Phelan, California which is in San Bernardino County.

16.    Defendant Snowline JUSD Board of Trustees[3] is the school board responsible for overseeing the schools within its district, including Serrano High School.

17.    Defendant Snowline Joint Unified School District is the school district that Serrano High School is in and is the entity that advised J.D. that she will not be able to attend her senior year of high school without receiving an aPV.

18.    Rob Bonta, in his capacity as the California Attorney General, shall be provided notice of this complaint contemporaneous with service of this complaint upon the Defendants.

---

[3] a/k/a the Snowline JUSD Governing Board a/k/a the Snowline Board of Education.

**JURISDICTION AND VENUE**

19.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a).

20.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**FACTS**

**I.    J.D.'s Relevant Medical History**

21.     An aPV is only available in combination with other vaccines as follows: (i) a diphtheria, tetanus, and acellular pertussis vaccine ("**DTaP**"), licensed for children up to 6 years of age; and (ii) a tetanus, *reduced* diphtheria, and *reduced* acellular pertussis vaccine ("**Tdap**"), licensed for those 10 years of age and older.  For those that cannot receive aPV, there is a diphtheria and tetanus vaccine ("**DT**") licensed for children up to 6 years of age, and a tetanus and *reduced* diphtheria vaccine ("**Td**") licensed for those 7 years of age and older.

22.     As noted, Plaintiffs are both fully vaccinated and their three children are fully vaccinated, with the exception of J.D. who is only missing one dose of aPV.  When J.D. was born, Plaintiffs intended to fully vaccinate her as they did her older sister.

23.     At J.D.'s two-month well baby visit with her pediatrician, she was administered a DTaP along with other vaccines.

24.     Within an hour of their administration, J.D. began severe, persistent, and inconsolable high-pitched screaming and crying contemporaneous with stiffening of her body.  During this period, she evidenced decreased consciousness by lack of eye contact, lack of feeding, and general lack of interest in objects and her surroundings.  When J.D.'s severe crying subsided, she continued to exhibit decreased consciousness by exhibiting lethargy and being far more tired than usual. She also developed a persistent fever of approximately 104 to 105 degrees that lasted for at least several hours.  Plaintiffs were

8

severely distressed with J.D.'s behavior as she had never behaved this way prior to being vaccinated.  Holly took J.D. to her sister, who is an emergency room technician and, while having a healthcare provider in close proximity, her sister advised that J.D. was suffering from an adverse reaction.

25.     The pediatrician told Plaintiffs in no uncertain terms that J.D. had a serious adverse event to the pertussis component of the DTaP vaccine.  She therefore recommended and J.D. received, without incident, doses of DT in lieu of the required DTaP doses, and a dose of Td in lieu of the required dose of Tdap.

26.     J.D. obtained a medical exemption to the aPV due to her adverse reaction. However, on June 1, 2021, Defendant Snowline Joint Unified School District informed Plaintiffs and J.D. that her medical exemption had been revoked because it was issued by a doctor subject to discipline, who happened to be J.D.'s longstanding physician, and indicated that she would therefore be excluded from her senior year of high school unless J.D. began "her new immunization requirements" or obtained a new exemption. J.D.'s current physician is not willing to write a medical exemption even though J.D. has a medically accepted contraindication to aPV.  There is a credible threat of reprisal from the CDPH and the Medical Board irrespective of the validity of the medical exemption. This threat is particularly credible given that the statutory scheme in California contains numerous statements deterring physicians of ordinary firmness from writing such an exemption.

27.     Because J.D. has not received all doses of the aPV and because she can no longer obtain a medical exemption to aPV, Defendants will exclude her from her senior year of high school.

28.     J.D. will suffer irreparable harm if she is excluded from her senior year of high school.   J.D. has attended the Snowline Joint Unified School District since kindergarten and has attended Serrano High School for the past three years for 9th through 11th grades.  Her older sister attended the same schools in the same district from

VERIFIED COMPLAINT

kindergarten through 12th grade and her younger sister is currently attending and entering the 9th grade at Serrano High School.

## II.   Vaccines for Pertussis

29.   All pertussis, tetanus, and diphtheria containing vaccines licensed by the FDA are summarized in the following chart:

| Type | Brand | Manufacturer | Year Licensed | Approved Ages |
|------|-------|--------------|---------------|---------------|
| **DT** | generic | Sanofi | 1978 | 6-weeks to 6-years |
| **DTaP** | Daptacel | Sanofi | 1997 | 6-weeks to 6-years |
| **DTaP** | Infanrix | GSK | 2002 | 6-weeks to 6-years |
| **Td** | Tenivac | Sanofi | 2003 | 7 and older |
| **Tdap** | Boostrix | GSK | 2005 | 10 and older |
| **Tdap** | Adacel | Sanofi | 2005 | 10 and older |

30.   Pertussis vaccines are designed to force the body to generate antibodies to antigens secreted by or found on the surface of the pertussis bacteria.   The pertussis bacteria are estimated to have at least thousands of antigens on its surface or secreted proteins.  All pertussis containing vaccines used in the United States contain only 5 of these antigens, and hence can only generate antibodies to 5 of the pertussis bacteria antigens.

31.   By generating antibodies to only 5 of the thousands of pertussis bacteria antigens, the result is that the vaccinated person may have few or no symptoms if infected with pertussis *but will still become colonized with and silently transmit pertussis*.

32.   This defective immunity remains even after an individual vaccinated for pertussis becomes infected with pertussis.  The body of a pertussis-vaccinated individual will continue to generate a vigorous immune response only to the 5 antigens included in the pertussis vaccine, but not to other pertussis antigens.  This defective immune response

10

appears to remain irrespective of how many times the individual vaccinated for pertussis is infected with pertussis.

33.    This defective immunity is caused by what is known as "linked epitope suppression" which locks in the initial immune response created by the 5 select antigens in the pertussis vaccine.  An epitope is the portion of the antigen to which an antibody will bind.  Since the pertussis vaccine generates antibodies to only 5 epitopes (antigens) of the pertussis bacteria, when the body later encounters the pertussis bacteria, it generates antibodies to these 5 antigens but does not generate antibodies to the other surface antigens of the pertussis bacteria that might be crucial for preventing further re-infection.  Due to "linked epitope suppression," the generation of antibodies to the 5 epitopes from the pertussis vaccine suppresses the creation of antibodies to a broader range of other epitopes that comprise the pertussis bacteria.

34.    The defective immunity to pertussis created by the pertussis vaccine appears to remain for the entire lifetime of the vaccinated individual.  This renders individuals vaccinated for pertussis susceptible to repeatedly become infected with pertussis bacteria, potentially every few weeks for the rest of their life.

35.    In contrast, an individual that has not received an aPV and is exposed to pertussis will generate antibodies to the broad array of pertussis antigens, and when re-exposed to pertussis, their immunity prevents the pertussis bacteria from colonizing the respiratory tract.

**III.    California Requires aPV to Attend School**

36.    In order to attend school, California law requires children younger than seven years to have received 5 doses of DTaP (or 4 doses if one is received after the child's fourth birthday) and children seven years and older to have received one dose of Tdap and two doses of Td or DT:

11

**CALIFORNIA IMMUNIZATION REQUIREMENTS FOR**

# K – 12TH GRADE (including transitional kindergarten)



| GRADE | NUMBER OF DOSES REQUIRED OF EACH IMMUNIZATION[1, 2, 3] | | | | |
|---|---|---|---|---|---|
| K-12 Admission | 4 Polio[4] | 5 DTaP[5] | 3 Hep B[6] | 2 MMR[7] | 2 Varicella |
| (7th-12th)[8] | K-12 doses | + 1 Tdap | | | |
| 7th Grade Advancement[9,10] | 1 Tdap[8] | | | | 2 Varicella[10] |

1. Requirements for K-12 admission also apply to transfer pupils.
2. Combination vaccines (e.g., MMRV) meet the requirements for individual component vaccines. Doses of DTP towards the DTaP requirement.
3. Any vaccine administered four or fewer days prior to the minimum required age is valid.
4. Three doses of polio vaccine meet the requirement if one dose was given on or after the 4th birthday.
5. Four doses of DTaP meet the requirement if at least one dose was given on or after the 4th birthday. Three doses meet the requirement if at least one dose of Tdap, DTaP, or DTP vaccine was given on or after the 7th birthday (also meets the 7th-12th grade Tdap requirement. See fn. 8.)

   One or two doses of Td vaccine given on or after the 7th birthday count towards the K-12 requirement.
6. For 7th grade admission, refer to Health and Safety Code section 120335, subdivision (c).
7. Two doses of measles, two doses of mumps, and one dose of rubella vaccine meet the requirement, separately or combined. Only doses administered on or after the 1st birthday meet the requirement.
8. For 7th-12th graders, at least one dose of pertussis-containing vaccine is required on or after the 7th birthday.
9. For children in ungraded schools, pupils 12 years and older are subject to the 7th grade advancement requirements.
10. The varicella requirement for seventh grade advancement expires after June 30, 2025.

*See* https://eziz.org/assets/docs/IMM-231.pdf (emphasis added). *See also* Cal. Code Regs. Tit. 17 § 6025(c).

37.     California first added a requirement to receive a pertussis vaccine to attend school in 1977 and has increased the number of doses of required aPV over the years.[4] Since 1977, the percent of children attending school and adults vaccinated for aPV has steadily increased.[5]

38.     Nevertheless, and reflecting that the pertussis vaccine does not prevent infection and transmission, according to the California Department of Public Health, the number of cases of pertussis has steadily increased after California mandated this vaccine to attend school in 1977.[6]

---

[4]  *See*  http://www.leginfo.ca.gov/pub/15-16/bill/sen/sb_0251-0300/sb_277_cfa_201506 17_130902_asm_comm.html at p. 10 (last visited August 4, 2021).

[5]  https://www.cdc.gov/vaccines/pubs/pinkbook/downloads/appendices/e/coverage-levels. pdf (last visited August 4, 2021).

[6] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Im munization/Pertussis%20report%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.pdf#search=pertussis     (last   visited August 3, 2021).

VERIFIED COMPLAINT

39.     Further reflecting that the pertussis vaccine does not prevent infection and transmission, the incidence of pertussis has increased since the pertussis vaccine was mandated for school in 1977. According to the CDC, "[i]ncidence of reported pertussis has been increasing in the United States since the 1980s despite widespread use of pertussis vaccines."[7] This is so even though DTaP coverage has generally increased since that time.[8]

40.     Thus, requiring a pertussis vaccine to attend school in California did not reduce the incidence of pertussis in California.

## IV.     Safety of Pertussis Vaccine

41.     aPV is not without risk and can cause serious injuries.

### A.     *Companies Selling aPV Are Immune from Liability for Injuries*

42.     In the early 1980's, there were only three routine childhood vaccines, one of which was a pertussis vaccine. The financial liability for injury claims from this vaccine were many factors greater than the substantial revenue it generated.  As explained by the U.S. Supreme Court, "by the mid-1980's … the remaining manufacturer [of pertussis vaccine] estimated that its potential tort liability exceeded its annual sales by a factor of 200."  *Wyeth*, 562 U.S. at 226.

43.     In response, Congress passed the National Childhood Vaccine Injury Act of 1986, codified at 42 U.S.C. §§ 300aa-1 through 300aa-34 (the "**1986 Act**") which virtually eliminated financial liability for pharmaceutical companies for injuries caused by their vaccines.  42 U.S.C. § 300aa-11 ("No person may bring a civil action for damages in the amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death."); *Wyeth*, 562 U.S. at 243 ("[W]e hold that the National

_____

[7] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6348a2.htm (last visited August 3, 2021).

[8]      https://www.cdc.gov/vaccines/pubs/pinkbook/downloads/appendices/e/coverage-levels.pdf (last visited August 4, 2021).

13

Childhood Vaccine Injury Act preempts all design-defect claims against vaccine manufacturers brought by plaintiffs who seek compensation for injury or death caused by vaccine side effects.").[9]

44.    GlaxoSmithKline plc ("**GSK**") and Sanofi S.A. ("**Sanofi**"), the manufacturers of the pertussis containing vaccines in the United States, earn billions of dollars in sales annually from this product, but this is apparently still not sufficient revenue to offset the potential liabilities of compensating individuals for injuries caused by aPV.[10]

### B.    HHS and Its Agencies Solely Responsible for Vaccine Safety

45.    Recognizing the elimination of the financial incentive for companies to address vaccine safety, Congress enacted a statutory scheme which made HHS responsible for virtually every aspect of vaccine safety, and created the Vaccine Injury Compensation Program ("Vaccine Court"), part of the U.S. Court of Federal Claims. [11] *See* 42 U.S.C. § 300aa-25 to 29 ("Assuring a Safer Childhood Program in United States")[12]

---

[9] In addition to insulating pharmaceutical companies from financial liability for harm, the 1986 Act was intended to reduce the cost of vaccines.  However, the prices of tetanus, diphtheria and pertussis containing vaccines has rapidly increased since 1986 despite the fact that pharmaceutical companies have immunity from financial liability for injuries. Pharmaceutical companies sell their products to a captive market of 78 million children who are required to take them under penalty of expulsion from school, and HHS/CDC markets these products to the public using taxpayer money.  For example, the prices for the Td (tetanus and diphtheria) has increased 4,573% between 1987 ($.065) and 2006 ($29.73).

[10]    https://www.globenewswire.com/en/news-release/2020/01/17/1971809/0/en/Global-Diphtheria-Pertussis-and-Tetanus-DTaP-Vaccine-Market-is-Expected-to-Reach-USD-5-07-Billion-by-2026-Fior-Markets.html (last visited August 8, 2021).

[11]    https://www.uscfc.uscourts.gov/vaccine-programoffice-special-masters (last visited August 6, 2021).

[12] https://www.law.cornell.edu/uscode/text/42/300aa-25.

14

46.     As part of this safety program, HHS is required to produce a Vaccine Information Sheet ("**VIS**") for each vaccine to provide parents with important safety information. 42 U.S.C. § 300aa-26. The VIS for Tdap – the vaccine Defendants demand J.D. receive – explains that a parent should: "Tell your vaccination provider if the person getting the vaccine … [h]as had an allergic reaction after a previous dose … [or h]as had a … decreased level of consciousness … within 7 days after a previous dose of any pertussis vaccine."[13]  The VIS gives this advice to parents because the manufacturers of Tdap warn that "decreased level of consciousness within 7 days of a previous dose of a pertussis containing vaccine not attributable to another identifiable cause is a contraindication to administration of any pertussis containing vaccine."[14]  J.D. had decreased consciousness after aPV but yet is being required to get this vaccine again.

47.     The safety program also includes a "Mandate for Safer Childhood Vaccines" which contains three parts and underpins vaccine safety in this country.   42 U.S.C. § 300aa-27.  The first part requires the Secretary of HHS to make vaccines safer, the second creates a task force to make recommendations to the Secretary on how to make vaccines safer, and the third requires HHS to report to Congress every two years on the improvements to safety that were made.  *Id.*  Unfortunately, the task force required by part "b" of the Mandate was disbanded in 1998 and HHS has not prepared or filed a single biennial vaccine safety report for Congress as required by part "c" of the Mandate.  *See Informed Consent Action Network v. United States Department of Health and Human Services,* 18-cv-03215-JMF, (Doc # 18) (S.D.N.Y, July 9, 2018).  In the same manner that HHS has failed to fulfill its simple obligations under parts "b" and "c" of the Mandate, it appears to have failed to fulfill its far more difficult work required by part "a" of the Mandate to actually assure and improve vaccine safety.[15]

---

[13] https://www.cdc.gov/vaccines/hcp/vis/vis-statements/tdap.pdf
[14] https://www.fda.gov/media/124002/download; https://www.fda.gov/media/119862/download
[15] *See*  https://www.icandecide.org/wp-content/uploads/2019/08/ICAN-Reply-1.pdf.

15

48.     HHS has, however, vigorously fulfilled its obligations under the 1986 Act to increase vaccine uptake and defend against legal claims that a vaccine caused an injury. HHS spends over $5 billion annually promoting and purchasing vaccines and HHS vigorously defends against any claim brought in Vaccine Court.  An individual injured by a childhood vaccine must bring a claim against HHS in the Vaccine Court and HHS is legally obligated to defend against any claim that a vaccine causes injury.  42 U.S.C. § 300aa-12.   Hence, HHS, while responsible for vaccine safety, is simultaneously responsible for the conflicting duties of promoting vaccines and for defending against claims of vaccine injuries.

49.     In Vaccine Court, HHS is represented by the formidable resources of the U.S. Department of Justice ("**DOJ**") which vigorously defends against any claim that a vaccine has caused injury.  Congressional reports have found that "DOJ attorneys make full use of the apparently limitless resources available to them," "pursued aggressive defenses in compensation cases," and "establish[ed] a cadre of attorneys specializing in vaccine injury" and "an expert witness program to challenge claims."[16]

50.     A petitioner in Vaccine Court must almost always prove causation,[17] and assuming a petitioner files within the strict two or three year statute of limitations (42 U.S.C. § 300aa-16(a)), the burden to prove causation is far greater than would exist in a

---

[16]   https://www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf   (last   visited August 3, 2021).

[17] The 1986 Act created a Vaccine Injury Table (the "**Table**") which Congress intended the Vaccine Court to use to quickly compensate certain common vaccine injuries.  42 U.S.C. § 300aa-12. For injury types appearing on the Table, the burden was on the HHS to prove the vaccine is <u>not</u> the cause of the injury. On the other hand, if the injury was not on the table, the injured person carried the burden to prove causation.  42 U.S.C. § 300aa-13. After passage of the 1986 Act, almost 90% of claims were Table claims and quickly settled, just as Congress had intended. *See Stevens v. Sec'y of the HHS*, No. 99-594V, 2001 U.S. Claims LEXIS 67, at *20-25 (Fed. Cl. Mar. 30, 2001).  However, in the 1990s, HHS amended the Table such that now 98% of new claims are off-Table. *See* http://www.gao.gov/assets/670/667136.pdf.   As a result, today's parents of injured children must prove that the vaccine was the cause in almost all cases.

16

typical civil court because in Vaccine Court: (i) there is no discovery as of right which is only granted "in rare and exceptional cases;" (ii) most babies and toddlers are incapable of explaining their symptoms; (iii) medical experts typically will not testify for petitioners out of fear of being viewed as not supporting vaccines; and (iv) medical science is "a field bereft of complete and direct proof of how vaccines affect the human body." *Althen v. Sec'y of HHS*, 418 F.3d 1274, 1280 (Fed. Cir. 2005).

51.    Nonetheless, since 2000, HHS has paid over $500,000,000 for injuries caused by pertussis containing vaccines with a statutory cap of $250,000 per individual for death, and for pain and suffering.  42 U.S.C.A. § 300aa-15(a)(2), (4).  The following are some of the disorders and injuries following receipt of pertussis containing vaccines for which compensation was paid to claimants in Vaccine Court since 2000:

> abscess, acute disseminated encephalomyelitis (ADEM), acute liver failure, adhesive capsulitis, aggravation of pre-existing encephalopathy, agoraphobia, anaphylactic shock, anaphylaxis, antisynthetase syndrome, angiomatoid fibrous histiocytoma, anxiety, aplastic anemia, arm injury, arthritis, ataxia, autism, autoimmune hep type 2, autoimmune hemolytic anemia,  behavioral issues, bell's palsy, benign tumor, bilateral peripheral neuropathy, bilateral shoulder pain, bilateral symmetric diaphragmatic palsy, blindness, brachial neuritis, brachial plexopathy, brachial plexus neuritis, cardiac injury, celiac disease, cellulitis, cerebellitis, cerebellar ataxia, cerebrovascular accident, chest pain, choreiform movement disorder, chronic fatigue,  chronic gastrointestinal issues, chronic arthritis, chronic inflammatory demyelinating polyneuropathy (CIDP), chronic urticarial, demyelinating disease of central nervous system, demyelinating

17

polyradiculoneuropathy, chronic pain, complex regional pain syndrome, death, deltoid bursitis, demyelinating condition, demyelinating sensorimotor polyneuropathy, dermatomyositis, dravet syndrome, developmental delay, devic's disease, eczema, encephalitis, encephalopathy, epilepsy, Epstein-Barr virus, erythema multiforme major, Evans Syndrome, exacerbation of existing cardiomyopathy, expressive language delay, fatigue, fibromyalgia, frozen shoulder, gastrointestinal symptoms, gastroparesis, GM1 gangliosidosis, guillain-barré syndrome (GBS), headaches, hemophagocytic lymphohistiocytosis (HLH), hodgkin's lymphoma, hypereosinophilia, hypersensitivity, hypotensive-hyporesponsive shock collapse (HHE), hypoproteinemia, hypotonia, immobile flaccid legs, immune issues, immune thrombocytopenia purpa, increased risk of cancer, infantile spasms, inflammatory arthritis, joint pain, juvenile dermatomyositis, juvenile idiopathic arthritis, juvenile rheumatoid arthritis (JRA), kawasaki disease, keloid scarring, leukocytoclastic vasculitis (LCV), leukodystrophy, latent herpes simplex virus infection, lichen planus, lipomas, long thoracic nerve palsy, lupus (SLE), lymphangitis, lymphomatoid granulomatosis, macrophagic myofasciitis, meningoencephalitis, metal toxicity, mixed connective tissue disease (MCTD), monoplegia, multi organ failure, multiple sclerosis, muscle spasms, myalgias, myelitis, necrotizing pancreatitis, nerve damage, neurological injury, neuromyelitis optica (NMO), neuropathic arm pain, neuropathy, nodular

18

fasciitis, opsoclonus-myoclonus syndrome (OMS), ocular visual disturbance, optic neuritis, panic, overlap syndrome, panuveitis, panniculitis, parsonage turner syndrome, pemphigus vulgaris, peripheral neuropathy, permanent spastic tetraparesis, polyarthralgia, progressive encephalopathy, psoriatic arthritis, pulmonary edema, SIDS, radial nerve damage, rash, reactive inflammatory arthritis, reflex sympathetic dystrophy, residual seizure disorder (RSD), retro seizures, rhabdomyolysis, rheumatoid arthritis, rheumatologic injuries, scaring, scn1a, seizures, seizure disorder, sensory neuropathy, sensory polyneuropathy, serum sickness, sirva, small fiber neuropathy, shoulder pain, splenic rupture, abscesses, strep infection, stroke, suprascapular neuropathy, syncope, synovitis, tendonitis, tendinopathy, toxic epidermal necrolysis (TEN), toxic shock syndrome, transverse myelitis (TM), thrombocytopenic purpa, tics, tremors, undifferentiated connective tissue disease (UCTD), urinary incontinence, uticarial andgiodema, uveitis, vasculitis, vestibular neuronitis

52.    Any study by HHS, or its agencies, which supports that a pertussis vaccine causes a harm will be used as evidence against it in Vaccine Court. This creates a conflict for HHS in funding or conducting studies that may support that pertussis vaccines cause a given harm.

### C.    Clinical Trials for aPV Severely Limited

53.    To assess safety and effectiveness before release to the public, medical products licensed by the FDA typically undergo multi-year double-blind placebo-controlled clinical trials during which the rate of adverse reactions in a group receiving the unlicensed drug is compared to the rate in a group receiving a placebo. A "placebo"

19

is "[a] substance or treatment that has no effect on human beings,"[18] such as a saline injection.[19]

54.    For example, Enbrel's pre-licensure clinical trial followed subjects up to 80 months and controls received a saline injection.[20] Lipitor's pre-licensure trial lasted a median of 4.8 years and controls received a sugar pill.[21] Botox's pre-licensure trial lasted a median of 51 weeks and controls received a saline injection.[22] The weight loss drug Belviq, only indicated for adult use, was safety tested in a 2-year placebo-controlled clinical trial before being licensed.[23]

55.    The clinical trials relied upon to license pertussis vaccines did *not* have a placebo-control group and the safety review periods in these trials were typically one month after injection with, sometimes, a follow-up phone call at six months.

56.    For example, GSK's DTaP vaccine, Infanrix, was licensed based on a clinical trial which used a DTP vaccine (not a placebo) as the control and had a safety review period of around thirty days after injection.[24]  As another example, in the clinical trial for GSK's Tdap vaccine, Boostrix, "[s]erious adverse events were reported to occur by 4.2% . . . of subjects who received BOOSTRIX."[25]  However, because there was no placebo control group, the determination of whether each reported adverse event was related to Boostrix

---

[18] https://www.cdc.gov/vaccines/terms/glossary.html (last visited August 3, 2021).

[19]  https://www.nia.nih.gov/health/why-are-placebos-important (last visited August 8, 2021).

[20] https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/103795s5503lbl.pdf (last visited August 3, 2021).

[21]  https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020702s056lbl.pdf  (last visited August 3, 2021).

[22] https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/103000s5302lbl.pdf (last visited August 3, 2021).

[23]   https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/022529lbl.pdf   (last visited August 3, 2021).

[24]  https://www.fda.gov/downloads/biologicsbloodvaccines/vaccines/approvedproducts/ucm124514.pdf (last visited August 3, 2021).

[25] https://www.fda.gov/media/124002/download (last visited August 3, 2021).

was left to the discretion of GSK and its paid researchers.  If a placebo control group were used, then there would be no need for a case-by-case determination by GSK and its paid researchers regarding whether each reported adverse reaction was related to the vaccine under review.

57.     Because of the short duration, small sample size, and the lack of a placebo control in the clinical trials for the pertussis vaccines, their safety profiles beyond a limited duration were not determined before licensure.  After licensure, HHS becomes conflicted from publishing research that reveals that pertussis vaccines cause any particular harm.  Doing so eliminates HHS's ability to defend itself against claims alleging such harm in Vaccine Court, could tarnish the reputations of HHS and its agencies, and would reduce the public's trust in these federal health authorities because, unlike non-vaccine pharmaceutical drugs, HHS and its agencies spend billions of dollars annually purchasing, distributing, and vigorously promoting pertussis vaccines.[26]

### D. Post-Licensure Safety Studies Limited

58.     After licensure, it is considered unethical to conduct a placebo-controlled clinical trial and hence researchers are typically left with population studies (epidemiological studies).  These studies typically cannot prove or disprove causation

---

[26] In theory, the safety of vaccines should be at least partially ensured by the FDA and CDC at the time of licensure because these agencies (both part of HHS) should have an incentive to only license vaccines that are safe and will not cause harm. Unfortunately, Congress has repeatedly found that the members of the relevant FDA and CDC committees, serving during the period of time when the most recently licensed and recommended DTaP/Tdap vaccines were FDA approved, had serious conflicts of interests because "[t]he overwhelming majority of members [of the FDA's vaccine licensing committee], both voting members and consultants, have substantial ties to the pharmaceutical industry" and those pharmaceutical companies have an incentive to approve highly profitable vaccines as quickly as possible. https://tinyurl.com/3xawzcdc (last visited August 10, 2021). *See also* https://oig.hhs.gov/oei/reports/oei-04-07-00260.pdf (last visited August 3, 2021) (HHS Office of Inspector General found that the "CDC had a systemic lack of oversight of the ethics program for [advisory panel members].").

21

1   and are subject to biases (a.k.a., confounders),[27] and therefore, are considered a weak

2   form of scientific evidence.[28]

3       59.   Despite this limitation, as required by federal law, vaccine manufacturers are

4   to include in the package insert for each vaccine "*only* those adverse events for which there

5   is some basis to believe there is a *causal* relationship between the drug and the occurrence

6   of the adverse event."   21 C.F.R. § 201.57(c)(7) (emphasis added).   Pursuant to this

7   regulation, the inserts for DTaP and Tdap include over one hundred serious immune,

8   neurological and other chronic conditions that Sanofi and/or GSK has a basis to believe

9   are caused by their DTaP/Tdap products, including:

10         abnormal liver function tests, allergic reactions (such as

11         erythematous rash, maculopapular rash, urticaria and pruritus),

12         anaphylactic reaction (including bronchospasm, angioedema

13         edema, face edema, swelling face, pruritus, rash generalized),

14         anaphylactoid reaction, anaphylaxis, angioedema, apnea,

15         arthralgia, arthus hypersensitivity, back pain, brachial neuritis,

16         bronchitis, bulging fontanelle, cellulitis, collapse or shock-like

17         state (hypotonic153 hyporesponsive episode), convulsions

18

19   [27] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3505292/ (last visited August 6, 2021)

20   ("The advantage of trial over an observational study is the ability to demonstrate causality.").

21   [28] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3505292/ (last visited August 6, 2021)

22   ("Randomized double blind placebo control (RDBPC) studies are considered the 'gold

23   standard' of epidemiologic studies. If well designed, (they) provide the strongest possible evidence of causation."); https://www.cdc.gov/vaccines/hcp/acip-recs/general-recs/adverse-reactions.html (last visited August 3, 2021) ("[E]stablishing evidence for

24   cause and effect on the basis of case reports and case series alone is usually not possible";

25   rather, researchers need "to compare the incidence of the event among vaccinees with

26   the incidence among unvaccinated persons."); https://www.ncbi.nlm.nih.gov/¶

27   pmc/articles/PMC3505292/ (last visited August 4, 2021) (The entire advantage of a randomized placebo-controlled clinical trial "is the ability to demonstrate causality i.e.,

28   cause-effect relationship.").

22

(with or without fever), cyanosis, decreased appetite, depressed level of consciousness, diarrhea, dizziness, dyspnea, ear pain, edema, edema peripheral, encephalitis, encephalopathy, erythema, erythema multiforme, exanthem, extensive limb swelling from the injection site beyond one or both joints, extensive swelling of injected limb (including swelling that involves adjacent joints), face edema, facial palsy, fatigue, febrile convulsion, febrile seizure, grand mal convulsion, Guillain-Barré syndrome, Henoch-Schönlein purpura, HHE, hypersensitivity and allergic reactions (such as rash, urticaria, 121 dyspnea), hypersensitivity reaction (angioedema, edema, rash, hypotension), hypoesthesia, hyporesponsiveness, hypotonia, hypotonic-hyporesponsive episode (i.e., sudden onset of hypotonia, hyporesponsiveness, and pallor or cyanosis),induration, inflammation, injection site issues (including abscess, bruising, cellulitis, induration, inflammation, mass, nodule, lump, pain, pruritus, edema, vesicles), insomnia, large injection site reactions (>50 mm) including limb swelling which may extend from the injection site beyond one or both joints, lethargy, limb pain and swelling, listlessness, loss of consciousness, lymphadenitis, lymphadenopathy, macular, maculopapular rash, malaise, meningitis, muscle spasm, musculoskeletal stiffness or pain, myalgia, myelitis, myocarditis, myositis, nausea, nervousness, pain, pain in extremities, pallor, paresthesia, partial seizures, peripheral oedema, petechiae, pruritus, pyrexia, restlessness, rhinitis, screaming, seizure, shock, somnolence, sterile abscess,

23

> Sudden Infant Death Syndrome, sudden onset of hypotonia, swelling face, syncope, tenderness, thrombocytopenia, thrombocytopenia urticaria, unusual crying, urticaria, vasovagal responses to injection

The above list reflects mostly serious adverse events with relatively immediate onset following vaccination. Serious adverse events that occur over the long term are not likely to be deemed by GSK or Sanofi to be causally related to their products without a properly controlled longer term safety study – but, as noted, this is not done before or after licensure of pertussis vaccines.

60.    As for the prevalence of adverse events, the CDC and FDA's Vaccine Adverse Events Reporting System ("**VAERS**"), a passive reporting system[29] "to which fewer than 1% of vaccine adverse events are reported,"[30] has received over 149,207 reports of adverse events following pertussis containing vaccines, including 2,100 deaths, 2,544 permanent disabilities, 17,461 hospitalizations, and 41,753 emergency room or office visits.

---

[29] According to HHS, 83% of VAERS reports come from vaccine manufacturers, health care providers and state immunization programs, and 7% come from vaccine recipients or their guardians. https://www.fda.gov/media/93840/download at 6 (last visited August 4, 2021).

[30]    https://healthit.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf (last visited August 3, 2021). (An HHS-funded three-year study by Harvard researchers of VAERS involving 715,000 patients stated that "fewer than 1% of vaccine adverse events are reported."). *See also* https://www.congress.gov/congressional-report/106th-congress/house-report/977/1 (last visited August 4, 2021) ("Former FDA Commissioner David A. Kessler has estimated that VAERS reports currently represent only a fraction of the serious adverse events."); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3547435/ (last visited August 3, 2021) ("[A] confidential study conducted by Connaught Laboratories, a vaccine manufacturer, indicated that 'a fifty-fold underreporting of adverse events' is likely.").

61.     As for the gaps in the safety science for pertussis vaccine, the Institute of Medicine ("**IOM**") in 1991, as mandated by Congress, examined 18 commonly reported serious injuries following pertussis containing vaccines.[31] In this report, the IOM located sufficient science to support a causal connection between pertussis vaccines and four of the commonly reported serious injuries: acute encephalopathy, anaphylaxis, protracted inconsolable crying, and shock and unusual shock-like state.  The IOM, however, found the scientific literature was insufficient to conclude whether or not the pertussis vaccine can cause 10 of these commonly reported serious injuries:

> aseptic meningitis, autism, chronic neurologic damage, erythema multiforme, hemolytic anemia, Guillain-Barre syndrome, juvenile diabetes, learning disabilities and attention-deficit disorder, peripheral mononeuropathy, thrombocytopenia.

62.     The IOM stated that it "encountered many gaps and limitations in knowledge bearing directly and indirectly on the safety of vaccines"[32] and "[i]f research capacity and accomplishment in this field are not improved, future reviews of vaccine safety will be similarly handicapped."[33]

63.     Twenty-one years later, in 2012, at the commission of the CDC, the IOM examined 25 commonly reported serious injuries following aPV.[34]  The IOM found that the scientific literature was insufficient to conclude whether or not these are caused by aPV, including:

---

[31] https://www.nap.edu/read/1815/chapter/2#7 at p. 7 (last visited August 10, 2021).
[32] https://www.nap.edu/read/1815/chapter/2#8 at p. 8 (last visited August 10, 2021).
[33] https://www.nap.edu/read/1815/chapter/9 at p. 206 (last visited August 10, 2021).
[34] https://www.nap.edu/read/13164/chapter/2#2 at pp. 3-9 (last visited August 10, 2021).

25

> acute disseminated encephalomyelitis, anaphylaxis, ataxia, autism, bell's palsy, chronic inflammatory demyelinating polyneuropathy, chronic urticaria, encephalitis, encephalopathy, Guillain-Barre syndrome, infantile spasms, multiple sclerosis, myocarditis, optic neuritis, opsoclonus myoclonus syndrome, seizures, serum sickness, transverse myelitis. [35]

Thus, the IOM found that the science simply had not been performed to determine if there is a causal relationship between this vaccine and all of the commonly claimed serious injuries following pertussis containing vaccines.

64.   As for which children are likely to be harmed by a vaccine, in 1994, the IOM stated that "[t]he committee was able to identify little information pertaining to why some individuals react adversely to vaccines when most do not" and urged that "research should be encouraged to elucidate the factors that put certain people at risk."[36]

65.   Seventeen years later, in 2012, the IOM acknowledged this research had still not been done:

> Both epidemiologic and mechanistic research suggest that most individuals who experience an adverse reaction to vaccines have a preexisting susceptibility. These predispositions can exist for a number of reasons – genetic variants (in human or microbiome DNA), environmental exposures, behaviors, intervening illness, or developmental stage, to name just a few – all of which can interact …

---

[35] https://www.nap.edu/read/13164/chapter/2#2 at pp. 3-9 (last visited August 10, 2021).

[36] https://www.nap.edu/read/2138/chapter/12#307 at p. 307 (last visited August 10, 2021).

VERIFIED COMPLAINT

> Some of these adverse reactions are specific to the particular vaccine, while others may not be.   Some of these predispositions may be detectable prior to the administration of vaccine … much work remains to be done to elucidate and to develop strategies to document the immunologic mechanisms that lead to adverse effects in individual patients.[37]

66.    In 2013, the IOM again found that while "most children who experience an adverse reaction to immunization have preexisting susceptibility" it "found that evidence from assessments of health outcomes in subpopulations of children who may be potentially susceptible to adverse reactions to vaccines (such as children with a family history of autoimmune disease or allergies or children born prematurely) was limited and is characterized by uncertainty[.]"[38]

67.    Also, while short term adverse events are common after aPV, science does not yet know "if there is a relationship between short-term adverse events following vaccination and long-term health issues"[39]  despite the CDC explaining that "long-term adverse events may be more biologically plausible than short-term events."[40]

68.    One of the few studies that have conducted a comparison between children receiving pertussis vaccine and those without this exposure has found troubling results. For example, the seminal natural experiment comparing death rates between babies

---

[37] https://www.nap.edu/read/13164/chapter/5#82 at pp. 82, 84 (last visited August 10, 2021).
[38]  https://www.nap.edu/read/13563/chapter/9#130 at p. 130 (last visited August 10, 2021).
[39] https://www.nap.edu/read/13563/chapter/5#46 at p. 46 (last visited August 10, 2021).
[40] https://www.cdc.gov/vaccinesafety/pdf/whitepapersafety_web.pdf (last visited August 3, 2021).

27

1  receiving pertussis containing vaccines and those receiving no vaccines during the first

2  six months of life found that the vaccinated babies died at ten times the rate.[41]

3  ## V. California Eliminates Exemptions to School Vaccination Requirements

4  69.    The relief valve for the foregoing gap in scientific knowledge regarding

5  pertussis vaccines was bridged by the existence of a personal belief exemption to

6  vaccination in California.  In 1961, when the Legislature added the first vaccine required

7  to attend school in California, it also provided that "[i]mmunization of a person shall not

8  be required for admission to a public or private … school … if such immunization is

9  contrary to his or her beliefs" (the "**PBE**").[42]

10  70.    The PBE was eliminated by the California legislature effective January 1,

11  2016, for all vaccines, including pertussis containing vaccines.[43]

12  71.    The California legislature has also effectively eliminated the medical

13  exemption to required vaccinations for school by a law that became effective on January

14  1, 2020.   To obtain a medical exemption, California law now requires "licensed

15  physicians and surgeons" to transmit "an electronic, standardized, statewide medical

16  exemption certification form … directly to the department's California Immunization

17  Registry" where it is subject to review and attack by the CDPH, including placing the

18  licensure of the physician granting the medical exemption in jeopardy.  Cal. Health &

19  Saf. Code § 120372(a)(1).

20  72.    In practice, it is effectively impossible to obtain a medical exemption in

21  California with the exception of extremely limited circumstances of severe cases of

22  immunodeficiency, and then only with regard to live vaccines.  CDPH may demand that

23  the doctor who wrote the exemption provide direct support and proof to affirm the

---

24  [41]   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5360569/  (last  visited  August  3,

25  2021).

26  [42]https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/archive/Statutes/1961/61Vol1_61Chapters.pdf#page=2, at p. 1597 (last visited August 4, 2021).

27  [43] https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160SB277

28  (last visited August 4, 2021).

exemption despite the fact that, like most of medicine, it is based on clinical judgment. Cal. Health & Saf. Code § 120372(d)(3)(A).   Medical exemptions are subject to revocation by the State Public Health Officer or "the reviewing immunization department staff member[.]" Cal. Health & Saf. Code § 120372(a)(3)(C). Even more chilling is that "[i]f the department determines that a physician's and surgeon's practice is contributing to a public health risk[,]"—and the CDPH views every medical exemption as contributing to public health risk since they view each unvaccinated child as a public health risk – the department has authority to "report the physician and surgeon to the Medical Board of California" which can discipline the physician up to and including revocation of her or his license.  Cal. Health & Saf. Code § 120372(a)(7)(A).  This creates a credible threat of licensure revocation for any physician to write a medical exemption, regardless of whether science and medicine support it, and regardless of whether or not the failure to do so will cause serious harm to the particular child.

73.   The effect of these measures is to deep freeze the doctor-patient relationship by instilling an incredible level of fear into the minds of all doctors that may otherwise write a medical exemption for J.D. based on her prior adverse reaction to aPV.  Any action by the CDPH regarding a doctor's medical exemption can become public and the result, in the mind of the doctor, may be a fate worse than losing their license – they may be attacked as an "anti-vaxxer."  This is exactly what this regulatory regime for medical exemptions is designed to accomplish and it has been extremely effective in dissuading any doctor in California from daring to write a medical exemption, except for, and maybe not even then, the most extreme situations.

74.   Since it is medically accepted that various factors can render a child more susceptible harm from a vaccine (*supra ¶¶* 62-64), parents and their children's doctors should have complete, uncoerced discretion to decide whether to vaccinate, especially when there are gaps in the scientific data or scientific literature.

## VI.    <u>J.D. to be Excluded from School</u>

75.    When health authorities are not conducting the studies to determine which serious adverse events are actually caused by the pertussis vaccine (*supra* ¶¶ 59-61), let alone which children are susceptible to injury from this vaccine (*supra* ¶¶ 62-64), and where private interests are profiting without fear of liability for injuries and the public is spending billions of dollars promoting these products and defending them from any claim of harm (*supra* § IV(B) and ¶ 42), the ability to *withhold* consent without the coercive threat of expulsion from school is the only protection that a child has where the child's parent or doctor perceives the child has a risk of suffering a serious adverse event from a vaccine.

76.    While every dose of GSK's or Sanofi's pertussis vaccine is purported to be the same, every child is different.  The IOM clearly and expressly acknowledge that susceptibility to a serious adverse reaction must be done on an individual basis, considering, *inter alia*, the specific child's personal genetics, personal behaviors, microbiome composition, intervening illness, developmental stage, and present and past environmental exposure.[44]

77.    While most parents give their children all doses of a pertussis containing vaccine, as Plaintiffs did for their oldest child and youngest child, some choose to delay or skip one or more of these doses precisely because they assessed the heighted risk of individual harm to the most important person in their lives.  This is an assessment that must be left in the hands of the child's parent and doctor.

78.    Plaintiffs, as well as J.D.'s pediatrician who treated her throughout her childhood, have the informed understanding that J.D. should not receive another aPV, based on her prior serious adverse reaction to an aPV.  All evidence, to a reasonable certainty, demonstrates that J.D. is not a fit subject for this vaccination, and by reason of

---

[44] https://www.nap.edu/read/13164/chapter/5#82 at pp. 82-83 (last visited August 8, 2021).

her current condition, such administration would seriously impair her health and has the possibility of causing her death.  With the elimination of the PBE and the nearly illusory medical exemption that few doctors dare write, Plaintiffs are left with having to choose between risking serious harm by vaccinating J.D. with Tdap or accepting that she will be precluded from attending her senior year in high school.

79.     Plaintiffs should not have to make this choice because Defendants do not have a compelling interest, let alone a rational basis, to exclude J.D. from school for missing one dose of a pertussis vaccine that, even if administered, does not prevent infection or transmission from person to person.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

### Violation of the Fourteenth Amendment

### Parental Choice, Bodily Integrity, And Informed Consent

80.     The preceding paragraphs are hereby realleged and incorporated herein by reference.

81.     Plaintiffs are fully competent and able to make decisions based on the best interests of J.D.  Informed consent requires that an individual be informed of the risks and benefits of a medical procedure and then be provided the uncoerced discretion to decide whether to consent to the medical procedure.  Based on their intimate knowledge of J.D., including J.D.'s individual medical and familial histories, and their knowledge regarding the pertussis vaccine and of pertussis itself, Plaintiff and J.D. oppose injecting J.D. with a pertussis vaccine.

82.     The United States Constitution guarantees the fundamental right to parental choice, including medical choice, the fundamental right to bodily integrity, the fundamental right to informed consent prior to administering a medical procedure, and the substantive due process rights to liberty and to life.

31

83.    None of these fundamental rights can be infringed upon without a compelling state interest that is implemented in the least restrictive means.

84.    California law requires expulsion of a student from school who is not injected with a certain number of doses of pertussis vaccine. *See* Cal. Health & Saf. Code § 120335(b) ("The governing authority shall not unconditionally admit any person as a pupil of any . . . school . . . unless" the child "has been fully immunized.").

85.    Prior court decisions have found that a compelling state interest to control the spread of infection from student-to-student can trump certain constitutional rights in certain situations.  This compelling state interest is absent with regard to vaccination for pertussis since this vaccine does not prevent vaccinated students from becoming infected and transmitting pertussis.

86.    Researchers at the FDA and at premier universities have established that, while pertussis vaccines decrease the odds of a person experiencing the symptoms of pertussis, they create a defective form of immunity to pertussis in the person receiving this product.  This defective immunity actually renders them susceptible to becoming repeatedly infected with pertussis, potentially every month, without knowing they are infected.  For example, sixteen scientists and professors considered world leading experts in pertussis, a number of whom have served as advisors, consultants, public speakers, and/or advisory board members to manufacturers of pertussis vaccines, participated in a Consensus Conference organized by the World Association for Infectious Disease and Immunological Disorders on June 22, 2018, regarding the pertussis vaccine.  These scientists and professors, along with this association, then published a peer reviewed publication explaining, in relevant part, that:

> Natural infection evokes both mucosal and systemic immune responses, while aPVs induce only a systemic immune response. …  Mucosal immunity is essential to prevent colonization and transmission of B. pertussis

VERIFIED COMPLAINT

organisms. Consequently, preventive measures such as aPVs that do not induce a valid mucosal response can prevent disease **but cannot avoid infection and transmission**.

…

aPV pertussis vaccines do not prevent colonization. Consequently, **they do not reduce the circulation of *B. pertussis* and do not exert any herd immunity effect.**[45]

This peer reviewed publication similarly explained in its conclusion that "Lack of mucosal immune responses after aPV [acellular pertussis vaccines] administration favor infection, persistent colonization, and transmission of the pathogen."[46]

87.    Pertussis vaccines only afford personal protection by reducing the symptoms of pertussis but do not reduce the circulation of pertussis bacteria and do not exert any herd immunity effect.

88.    In fact, the form of immunity created by the pertussis vaccine renders those vaccinated susceptible to becoming repeatedly infected with pertussis bacteria while not presenting symptoms.  In other words, those vaccinated for pertussis can repeatedly become infected and are capable of transmitting pertussis while presenting no or few symptoms.  On the other hand, the student that is not vaccinated for pertussis may become infected with pertussis bacteria once, will have symptoms and know to stay home, and for many years thereafter will have immunity that prevents the student from becoming re-infected and transmitting pertussis.

---

[45] https://pubmed.ncbi.nlm.nih.gov/31333640/ (emphasis added) (last visited August 4, 2021).

[46] *Id. See also* Vaccine (2018) https://pubmed.ncbi.nlm.nih.gov/29180031/ ("[N]either DTP, nor DTaP or Tdap prevent asymptomatic infection and silent transmission of the [pertussis] pathogen").

33

89.     Hence, excluding a child from school as a means to compel such child to receive an injection of a pertussis vaccine does not pass strict scrutiny.  There is also no rational basis to exclude J.D. from school since those vaccinated with the pertussis vaccine are at least as likely, and in fact more likely, to spread the pertussis bacteria.

90.     Further, the scheme at issue related to California medical exemptions for a vaccine, no matter how valid or necessary, and the threats and penalties inherent in it for any physician who even contemplates writing such an exemption, invades a fundamental liberty interest between doctor in patient, particularly as applied to the Plaintiff and unreasonably invades and constitutes an undue burden upon the physician-patient relationship.

91.     Conditioning school attendance upon the injection of a pertussis vaccine therefore infringes upon the fundamental right to parental choice, the fundamental right to bodily integrity, the fundamental right to informed consent prior to administering a medical procedure, and the substantive due process rights to liberty and to life.

92.     Wherefore, the portions of California law (and specifically, Cal. Health & Safety Code §§ 120335(b)(5) and (d) and Cal. Code Regs. Tit. 17, §§ 6025 and 6035) that require pertussis vaccination to attend school should be struck down for violating the foregoing fundamental rights arising from the Fourteenth Amendment of the United States Constitution.

VERIFIED COMPLAINT

## **SECOND CAUSE OF ACTION**

### **42 U.S.C. § 1983**

### **Violation of the Fourteenth Amendment**

### **Life and Liberty**

93.    The preceding paragraphs are hereby realleged and incorporated herein by reference.

94.    The United States Constitution guarantees the fundamental substantive due process right to life, which cannot be infringed upon without a compelling state interest that is implemented in the least restrictive means.

95.    Plaintiffs and their child have a substantive due process right to life and liberty.

96.    The pertussis vaccine can cause some children to be seriously injured or die as a result of being vaccinated.  The research has not yet been done to know which children are susceptible to serious injury or death from this product.  Administering a pertussis vaccine could deprive a child of life.  Plaintiffs have concluded, at the advice of J.D.'s pediatrician, that their child has a heightened risk of serious injury or death from this product and oppose injecting this product into their child.  There is no science to guarantee that Plaintiffs' child will not die from this product.

97.    Conditioning school attendance upon the injection of a pertussis vaccine where the child's parent has chosen to not administer this product to their child and there is no science to guarantee that their child will not die or be seriously injured from this product, infringes upon their and their child's fundamental right to life and liberty.

98.    Moreover, while these products are not risk-free, federal law provides GSK and Sanofi near complete immunity from liability for injuries caused by their vaccine products.  Requiring injection of pertussis vaccine in order to attend school over Plaintiffs' objection, where the companies that are manufacturing and selling this product

35

1   cannot be held accountable for injuries, is also a violation of the substantive due process
2   right to life and liberty.

3        99.    Constitutional rights and the application of facts to ascertain whether such
4   rights exist in a given situation can sometimes be perplexing.  That should not be the case
5   when it comes to determining whether the light of protection intended by the Constitution
6   extends to the question of whether the state can require injection of a product where the
7   for-profit company that makes and sells the product has not conducted the studies needed
8   to ascertain who will be susceptible to serious injury and death despite billions in revenue
9   and where such company cannot be held accountable in a civil suit for injuries caused by
10  the product.  Setting this line will not prohibit a state from requiring injection of such a
11  product.  It will only prohibit the state from doing so during the period that the companies
12  that make and sell the product cannot be held financially accountable for the injuries
13  caused by their product.

14       100.   Plaintiffs are fully competent and able to make decisions based on the best
15  interests of their child.  Since pertussis vaccine products can cause death and serious
16  injury, the science needed to validate which children are likely to be injured from such
17  product have not been undertaken, and Plaintiffs in consultation with their child's treating
18  pediatrician believe their child has a heighted risk of serious injury or death from a
19  pertussis vaccine, requiring them to administer this product to their child to attend school
20  violates their and their child's substantive due process right to life and liberty.  This is
21  particularly true in the absence of an actual emergency as may occur during wartime.

22       101.   Wherefore, the portions of California law (and specifically, Cal. Health &
23  Safety Code §§ 120335(b)(5) and (d) and Cal. Code Regs. Tit. 17, §§ 6025 and 6035)
24  that require injecting pertussis vaccine products into the body in order to attend school
25  should be struck down as a violation of the substantive due process clause right to life
26  and liberty because: (i) these products can cause serious injury and death; (ii) the studies
27  needed to ascertain which children are at heightened risk of serious injury or death have

28

36

not been undertaken; (iii) Plaintiffs' and their child's treating pediatrician believe their child has a heighted risk of serious injury or death from this product; and (iv) the pharmaceutical companies that manufacture and sell these products cannot be held financially accountable for harms caused by these products, hence lacking the normal market forces that drive product safety.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983**

**First Amendment**

**Freedom of Religion**

102.   The preceding paragraphs are hereby realleged and incorporated herein by reference.

103.   Plaintiffs and their child have a fundamental right to free exercise of religion.

104.   Plaintiffs' deeply and sincerely held religious beliefs prevent them from injecting their child with a product that they sincerely believe could harm their child.

105.   The United States Constitution guarantees the fundamental right to free exercise of religion which cannot be infringed upon without a compelling state interest that is implemented in the least restrictive means.  As described in preceding paragraphs, which are incorporated herein by reference, the compelling state interest for mandating certain vaccines for school is absent with regard to the pertussis vaccine.

106.   California law must provide a religious exemption to vaccination because it provides a non-religious exemption from vaccination—that is, an extremely limited medical exemption.  *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993) ("[I]n circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of 'religious hardship' without compelling reason." (internal quotation marks

37

omitted)). *See also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364 (3rd Cir. 1999) ("[R]efusal to make religious exemptions from its … policy should be reviewed under strict scrutiny because the Department makes secular exemptions to its policy.").

107.   As described in preceding paragraphs, which are incorporated herein by reference, the compelling state interest for mandating pertussis vaccines for school attendance is absent with regard to the pertussis vaccine.

108.   Wherefore, the portions of California law (and specifically, Cal. Health & Safety Code §§ 120335(b)(5) and (d) and Cal. Code Regs. Tit. 17, §§ 6025 and 6035) that require pertussis vaccination for school should be struck down for failing to provide a religious exemption while providing a non-religious exemption to vaccination and for otherwise violating the free exercise clause, including as applied to Plaintiffs.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Fourteenth Amendment & First Amendment
### All Rights Provided Thereunder

109.   The preceding paragraphs are hereby realleged and incorporated herein by reference.

110.   California law prohibits a student from attending school in California without receiving doses of pertussis vaccination. *See* Cal. Health & Safety Code §§ 120335(b)(5), (d); Cal. Code Regs. Tit. 17, §§ 6025 and 6035.

111.   Striking a balance between individual liberty and permitting a state's compelling interest to infringe on that liberty in the least restrictive means possible, can be a delicate balance.  The lines are often gray.  In this case, the only complexity is that the product at issue is labeled a "vaccine" even though it provides mere personal protection.  If the product at issue was labeled a "drug" or "exercise" or "vitamin" or

anything else the state may want children to take or do for the potential personal benefits, there would be no gray area. In that situation, it would be simple to see that depriving a child of a taxpayer funded government benefit (*i.e.*, attending school) for not engaging in some favored conduct lacks a rational basis, let alone a compelling interest. The only complexities here are the assumptions and beliefs, often fervent and deeply held, once the term "vaccine" is added to the activity at issue.

112.    However, the facts regarding pertussis vaccines do not support infringing upon Plaintiffs' constitutional rights because:

a.   Injecting a child with pertussis vaccine does *not* prevent the child from becoming infected with and transmitting pertussis (and in fact renders the child susceptible to repeated pertussis infection without presenting symptoms);

b.   The incidence of pertussis in California increased after the pertussis vaccine was required to attend school;

c.   The pharmaceutical companies which manufacture and sell all pertussis vaccines in the United States are immune from liability for injuries caused by these products despite billions of dollars in sales annually from these products;

d.   The pharmaceutical companies selling pertussis vaccines lack the financial incentive to assure the safety of their pertussis vaccine products because they are immune from liability for injuries caused by such products, and irrespective of advances in medical science, no design defect claim can ever be asserted against GSK and Sanofi for failing to improve the safety of their pertussis vaccines;

e.   The health authority responsible for vaccine safety, HHS, is responsible for the conflicting duties to increase vaccine uptake and to defend against any claim that these vaccines cause injuries in court;

39

f.  None of the pertussis vaccines were licensed based on clinical trials that included a control group that received a placebo (or at least another vaccine that was licensed based on a placebo-controlled clinical trial), and the safety review period after injection was typically six months or less;

g.  The only natural experiment of pertussis containing vaccines that included an unvaccinated control group found that those receiving this vaccine in the first six months of life died at ten times the rate as children who received no vaccines during this period;

h.  Studies have *not* been conducted to determine whether pertussis vaccines cause: (i) what the CDC asserts are the most commonly claimed injuries from this product, including acute disseminated encephalomyelitis, ataxia, autism, bell's palsy, chronic inflammatory demyelinating polyneuropathy, chronic urticaria, encephalitis, Guillain-Barré syndrome, infantile spasms, multiple sclerosis, myocarditis optic neuritis, opsoclonus myoclonus syndrome, seizures, scrum sickness, and transverse myelitis; (ii) cancer, infertility, or genetic defects; or (iii) the numerous serious conditions listed on the package insert for these vaccines, even though their manufacturers have a basis to believe such injuries are *caused* by these products; and

i.  It is medically accepted that pertussis vaccines can cause serious injury, but the studies to identify which children will suffer serious injury from these products have not been undertaken.

113.  Given the foregoing, if the pertussis vaccine can be mandated to be injected into the body of a child under duress of expulsion from school, then the liberty guaranteed by the Constitution is not meaningful.  Such a holding will affirm that rights can be

40

abrogated based on populist norms, rather than what the evidence can support.  That is not liberty.

114.   The Constitution and Bill of Rights become meaningful when they can act as a shield to protect minority views from those elected by the majority who pass laws affirming majority views at the expense of the minority.  It is in these moments that the courts give life and meaning to constitutional rights and safeguards, not only to protect the minority, but also to protect the principles in that founding covenant which protects all Americans.

115.   To sow justice, this case must turn on actual proof – not preconceived notions or assumptions.  Because the claims in the preceding paragraphs above are true, it is difficult to see how coercing injection of these products under penalty of exclusion from school in California can be constitutional.

116.   Wherefore, the portions of California law (and specifically, Cal. Health & Safety Code §§ 120335(b)(5) and (d) and Cal. Code Regs. Tit. 17, §§ 6025 and 6035) that require injecting a pertussis vaccine into the body in order to attend school should be struck down as a violation of the Constitution, including the First and Fourteenth Amendments.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiffs respectfully request that this Court:

A.   Grant declaratory relief and an injunction prohibiting the expulsion of a child from school for not being injected with a pertussis vaccine, either generally or as applied to the Plaintiffs and J.D.'s circumstances;

B.   Award attorneys' fees and costs of this action; and

C.   Grant such further relief as the Court deems necessary and proper.

Dated: August 19, 2021

SIRI & GLIMSTAD LLP

By:  /s/ Caroline Tucker
   Aaron Siri (Pro Hac Vice to be filed)
   Elizabeth Brehm (Pro Hac Vice to be filed)
   Caroline Tucker

CHRIS WIEST ATTORNEY AT LAW, PLLC
   Chris Wiest (Pro Hac Vice to be Filed)

   Attorneys for Plaintiffs
   ROBERT MASSETH
   HOLLY MASSETH

42

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# EASTERN DIVISION

ROBERT MASSETH and HOLLY
MASSETH, individually and on behalf of
their minor child, J.D.,

Plaintiffs,

-against-

WILLIE J. JONES III, in his official
capacity as the principal of Serrano High
School, *et al.*

Defendants.

Case No.

**PLAINTIFFS' VERIFICATIONS**

ROBERT MASSETH declares:

I, Robert Masseth, a citizen of the United States and of California, have read the foregoing Complaint and know the contents thereof as to myself, that the same is true to my own knowledge, and as to all other matters on information and belief and I believe them to be true.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _19th_ day of August, 2021, in California.

Robert Masseth

43

HOLLY MASSETH declares:

I, Holly Masseth, a citizen of the United States and of California, have read the foregoing Complaint and know the contents thereof as to myself, that the same is true to my own knowledge, and as to all other matters on information and belief and I believe them to be true.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __18__ day of August, 2021, in California.

